Vacated by Supreme Court, October 3, 2005

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                          No. 02-20

AQUILIA MARCIVICCI BARNETTE,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(CR-97-23-V)

Argued: September 23, 2003

Decided: December 6, 2004

Before WIDENER and NIEMEYER, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Widener wrote the opinion of
the court, in which Judge Niemeyer and Judge Michael concurred
except as to Part IV. Judge Niemeyer wrote the opinion in Part IV for
the court, in which Judge Michael concurred, and Judge Widener
wrote a concurring opinion as to Part IV.

## COUNSEL

**ARGUED:** Mark Evan Olive, LAW OFFICE OF MARK E. OLIVE,
P.A., Tallahassee, Florida, for Appellant. Matthew Theodore Martens,

Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Harold J. Bender, LAW OFFICE OF HAR-OLD J. BENDER, Charlotte, North Carolina, for Appellant. Robert J. Conrad, Jr., United States Attorney, Anne M. Tompkins, Assistant United States Attorney, Jill Westmoreland Rose, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

---

## OPINION

WIDENER, Circuit Judge:

This is the second time we have reviewed defendant Aquilia Mar-civicci Barnette's death sentence. In *United States v. Barnette*, 211 F.3d 803, 825-26 (4th Cir. 2000), we affirmed Barnette's convictions but vacated his death sentence because the district court erred in excluding the testimony of a defense expert during the sentencing hearing. We remanded the case to the district court for resentencing. 211 F.3d at 826. Upon remand, the district court conducted a sentencing hearing, and a second jury recommended the death sentence. The district court sentenced Barnette to death on August 20, 2002. Barnette appeals from this sentence. We affirm.

### I.

Barnette met Miss Robin Williams in 1994, and they began dating. Miss Williams lived in Roanoke, Virginia, and Barnette resided in Charlotte, North Carolina. After dating for about a year, Miss Williams and Barnette began living together in an apartment in Roanoke. The relationship flourished at first, but Barnette and Miss Williams began to argue over the issue of infidelity. According to a neighbor, Barnette abused Miss Williams, and one of Miss Williams' friends testified at the sentencing hearing that Miss Williams told her that Barnette had slammed Miss Williams into closet doors at the apartment. The relationship ended in April of 1996 after a fight in which Barnette attempted to choke Miss Williams. Barnette moved out of the apartment and returned to Charlotte. On April 29, 1996, Barnette called Miss Williams on the telephone and berated her over why she had broken up with him. Barnette became enraged when he learned

that Miss Williams was at her apartment with a male friend. Barnette borrowed his brother's car and drove to Roanoke. Along the way, Barnette filled two containers with gasoline and purchased a baseball bat. Barnette drove to Miss Williams's apartment and parked on a street near the apartment. Barnette took a pair of pliers, the baseball bat, and the containers of gasoline out of the car and walked to Miss Williams' apartment.

Barnette used the pliers to cut the telephone wires at Miss Williams' apartment. Barnette started screaming at Miss Williams and broke a window in the apartment with a baseball bat. Miss Williams' male friend, Benjamin Greene, testified that he was awakened by Miss Williams' screaming on the night of April 30, 1996, at some point between midnight and the break of dawn. He could not remember the exact time. Miss Williams attempted to call the police, but the phone line was dead. According to Greene, Barnette smashed the windows of Greene's car and screamed at Miss Williams, telling her that she was going to die tonight and that he (Barnette) was going to kill her. Sergeant R.S. Kahl of the Roanoke city police department testified that Miss Williams told him that Barnette was screaming "die, bitch, die," and Barnette testified that he did say "die, bitch, die."

Barnette kicked the door in, but it jammed. Barnette poured gasoline from one of the containers through the door and on a window sill. Barnette set fire to the gasoline and moved away from the apartment. Greene testified that Barnette threw a Molotov cocktail into the apartment. According to Greene, the Molotov cocktail set fire to the living room curtains. Barnette then poured gasoline from the other container onto Greene's car and set it afire. Barnette testified that he then heard what he believed to be a bullet zip past his ear. He dropped the bat and began running up the road toward his brother's car. Barnette reached his brother's car and began to drive away. He stopped to pick up the baseball bat. As Barnette picked up the bat, he could see that the apartment was burning.

In the burning apartment, Miss Williams and Greene could not escape through the front door. Instead, they went to Miss Williams' bedroom on the second floor, knocked out a window and the blinds at that window, and jumped from the second story window. Greene was unhurt after escaping the fire. Miss Williams suffered second-

degree burns on her right arm and second- and third-degree burns on her left arm. She underwent painful treatment and rehabilitation at the University of Virginia Health System in Charlottesville.

After the arson attack, Miss Williams spoke with Investigator K.O. Hubbard of the Roanoke city police department and identified Barnette as the perpetrator of the crime. Miss Williams gave the police Barnette's address in Charlotte and a description of the car. The Roanoke police obtained felony warrants against Barnette for two counts of attempted murder and two counts of arson/firebombing.

After leaving Miss Williams' apartment, Barnette drove to Charlotte. Barnette saw his picture on the television news in Charlotte, which reported that he was wanted for a firebombing in Roanoke. Barnette stayed away from his mother's house in Charlotte and took up residence with his cousin in east Charlotte. Barnette did not turn himself in to the police but instead waited for the police to arrest him.

On May 20, 1996, Barnette purchased a 12-gauge Stevens shotgun from a pawnshop in Charlotte using Virginia identification with the name of his brother, Mario Vonkeith Barnette. As part of the transaction, Barnette falsely stated on the federal firearms transaction form that he was neither a previously convicted felon nor a fugitive against whom charges were pending.[1]

The Stevens shotgun was defective, and Barnette exchanged it for a Winchester semiautomatic shotgun. Barnette hid the shotgun under his bed for a week before he cut off a portion of the shotgun's barrel and stock to "[m]ake it easier to conceal." Barnette collected shotgun shells, a crowbar, bolt cutters, and a pen flashlight. Barnette stored these items in a bag that he had used as luggage when he went to see Miss Williams. On the day before the murders, Barnette taped the flashlight to his shotgun and coated the lens with a red marker. On the morning of June 21, 1996, Barnette awoke after a night of drinking and, as he testified at the sentencing hearing, he came to the conclusion that this was the day that he and Miss Williams were going to die.

---

[1]Barnette was convicted in 1994 in Mecklenburg County, North Carolina Superior Court for felonious restraint. See N.C. Gen. Stat. § 14-43.3.

Before midnight on June 21, 1996, Barnette collected his shotgun and bag and walked a mile from his mother's house to the intersection of Billy Graham Parkway and Morris Field Road in Charlotte. Barnette testified that he needed to get to Roanoke to see Miss Williams and that he was going commit a carjacking to obtain a vehicle to drive to Roanoke. Barnette threw his bag into the bushes near the intersection, loaded his shotgun, crouched down, and waited.

A car came down to the intersection, with the window down and music blaring. Barnette ran to the car, put his shotgun to the window, and ordered the driver out of the vehicle. Barnette directed the driver toward the location of Barnette's bag. Once into the bushes and woods adjacent to the road, Barnette took the driver's wallet and then shot and killed the driver.

The driver was twenty-two-year-old Donald Lee Allen. Barnette shot Allen multiple times and left Allen's body in a ditch by the intersection. Barnette took Allen's blue Honda Prelude and began driving to Roanoke.

Barnette drove to Miss Williams' mother's house in Roanoke and parked Allen's car near the house. At morning twilight on June 22, 1996, Barnette saw Miss Williams come to the front door and let her dog out. Miss Williams' mother, Mrs. Bertha Williams, then came out to pick up her grandchild from a car that dropped her off outside the house. Barnette then moved Allen's car to the alleyway behind the house. Barnette got out of the car, removed his shotgun, and walked toward the back door of the house. Barnette moved through a gate in the fence and proceeded to the back of the house where he cut the telephone lines with wire cutters.

Barnette moved around to the kitchen door. He approached the door and tried to open it. After being unable to open the door, Barnette held back the screen door, held the gun with both hands, aimed at the dead bolt, and began firing. Barnette fired three shells into the door. Barnette entered the house and saw Miss Williams standing on the front porch holding the screen door open. After seeing Miss Williams, Barnette reloaded the shotgun.

Mrs. Williams saw Barnette and told Miss Williams to run. Barnette testified that he did not want to go through Mrs. Williams, and

he retreated out the back door of the house. Barnette testified that he knew that Miss Williams ran out by the front gate because he could hear that gate swinging. Barnette also went through the front gate of the fence. After he cleared the gate, Barnette looked for Miss Williams, and he caught sight of her as she came around the back of the duplex. Barnette began to chase her. A neighbor, Sonji Hill, heard the commotion and saw Miss Williams fleeing from Mrs. Williams' house.

Miss Williams fell twice as she tried to flee through a yard and over a hill. After she fell the second time in the nearby yard, Barnette grabbed her and began dragging her with his left hand while holding the shotgun in his right hand. Barnette tried to drag Miss Williams to the car. Miss Hill called the police, but, as she was talking on the phone on her porch, Barnette pointed his shotgun at her and told her to hang up the phone. Miss Hill hung up her phone and went back inside of her house.

Barnette told Miss Williams that he was going to kill her and that he had one shotgun shell for her and one for him. Miss Williams then tried to grab the shotgun from Barnette. As she reached for the shotgun, Barnette pulled back and shot her in her side. Miss Williams lifted her arm up and began to run towards her mother who was coming up the street. As Miss Williams ran toward her mother, Barnette shot Miss Williams in the back. Miss Williams fell right in front of her mother and died a short time later. Barnette testified that the reason he did not put the shotgun to his mouth and kill himself at that moment was because he panicked after seeing what the shotgun shells did to Miss Williams.

Barnette went to Allen's car and began to drive. Barnette drove on Interstate 81 South and arrived in Knoxville, Tennessee. In Knoxville, Barnette purchased some duct tape and a hose. Barnette testified that he attempted suicide by placing one end of the hose in the exhaust pipe of Allen's vehicle and the other end in the window of the car. Barnette did not complete the attempt. Barnette stole a Tennessee license plate and replaced Allen's South Carolina plate with the Tennessee plate.

Barnette left Knoxville and drove back to Charlotte. Barnette abandoned Allen's car at a shopping center in Charlotte on June 24, 1996.

Police officers discovered the vehicle that night. In a nearby dumpster, officers discovered Barnette's shotgun with the flashlight taped to it and a bag containing black pants, a black cap, a white towel, a garden hose, bolt cutters, and a crowbar.

Barnette made his way back to his mother's house. After meeting with his mother, Barnette prepared to meet agents of the FBI, who arrived at the house after Barnette's mother telephoned them. Barnette was taken to an FBI office and given his *Miranda* warnings. Barnette confessed to both murders and later rode with agents to the location where he had murdered Allen. Barnette also identified the car that he had stolen from Allen. Barnette's confessions are not at issue in this appeal.

II.

A grand jury indicted Barnette on 11 criminal charges: 1) interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a) & (b); 2) use of a destructive device, a firebomb, during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); 3) using and carrying fire and explosive materials during a felony, in violation of 18 U.S.C. § 844(h)(1); 4) making a false statement during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924; 5) making a firearm by sawing off his shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f) & 5871; 6) possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924; 7) commission of a carjacking that results in death, in violation of 18 U.S.C. § 2119(3); 8) using and carrying a firearm during and in relation to a crime of violence, namely a carjacking, in which death occurs, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1); 9) transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312; 10) interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b)(1); and 11) using and carrying a firearm during and in relation to a crime of violence, namely interstate domestic violence, in which death occurs, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1). After a trial in January of 1998, the jury found Barnette guilty on all counts. *Barnette*, 211 F.3d at 808. The district court held a sentencing hearing, the jury recommended, and the district court imposed, a death sentence on each of the capital counts, Counts Seven, Eight and Eleven.

211 F.3d at 808. The district court also sentenced Barnette to prison on the non-capital counts.

Barnette appealed his convictions and his sentence. We affirmed his convictions but vacated his death sentence. 211 F.3d at 826. We remanded the case back to the district court for resentencing as to the capital counts.

The district court commenced the sentencing hearing in July of 2002. The district court seated a new jury. After hearing the evidence presented at this sentencing hearing, the jury returned recommendations for death sentences on Counts Seven, Eight and Eleven. Barnette again appeals his death sentences.

### III.

Barnette raises several issues for review. In this appeal, he contends: 1) that *Ring v. Arizona*, 536 U.S. 584 (2002), requires a grand jury to consider and find statutory aggravating factors to make Barnette eligible for the death penalty under the Federal Death Penalty Act, 18 U.S.C. § 3591 et seq.; 2) that *Ring* renders the Federal Death Penalty Act unconstitutional; 3) that the district court violated Barnette's Constitutional rights by excusing a prospective juror who was partial to life imprisonment but could impose a death penalty and by not excusing a prospective juror who was partial to capital punishment and could not say that he could set aside his feelings; 4) that the government's exercise of peremptory challenges violated *Batson v. Kentucky*, 476 U.S. 79 (1986); 5) that the government's victim-impact evidence violated the Federal Death Penalty Act and *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled in part*, *Payne v. Tennessee*, 501 U.S. 808 (1991), and denied Barnette his right to a fair and reliable capital sentencing proceeding; 6) that the aggravating factor of "substantial planning and premeditation" was not supported by the evidence and that the district judge erred in answering the jury's question concerning this factor; 7) that the aggravating factor of commission of the offense in expectation of the receipt of anything of pecuniary value was not applied properly; 8) that Barnette was sentenced by a juror who had made up his mind about the result in violation of Barnette's right to a fair and reliable capital sentencing proceeding; 9) that issues previously raised by Barnette and rejected by the district

court and this court warrant a reversal of Barnette's death sentence; and 10) that inflammatory, unreliable, and prejudicial evidence infected the capital sentencing decision, allowing the death sentence to be imposed under the influence of passion, prejudice, or an arbitrary factor, and that the exclusion of rebuttal evidence requires resentencing. We address each issue.

IV.

NIEMEYER, Circuit Judge, writing for the court on the issue of whether the death sentences are invalid by reason of a constitutionally deficient indictment:

For his first argument on appeal, Barnette contends that his death sentences are invalid because the indictment "failed to charge any death-eligible offense, and the death sentences rest upon statutory aggravating factors which were not submitted to and found by the grand jury." Relying in part on *Ring v. Arizona*, 536 U.S. 584 (2002), which held that statutory aggravating factors required to render a defendant eligible for the death penalty are the functional equivalents of elements of a greater offense and must therefore be found by the jury, Barnette contends that these functional elements of a capital offense must also be alleged in the indictment. *See Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) ("[A]ny fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt"); *see also United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003) (holding that because at least one aggravating factor is required by the Federal Death Penalty Act "to render a defendant death-eligible," the indictment must allege at least "one such aggravating factor"); *cf. United States v. Wills*, 346 F.3d 476, 501 (4th Cir. 2003) (noting that *Ring* does not require "aggravating factors to be alleged in the indictment"). Accordingly, Barnette asserts that the death penalties imposed against him on Counts 7, 8, and 11 must be vacated.

Although *Ring* itself does not address the requirements of an indictment, the *Ring* Court made clear that when a statute requires the finding of an aggravating factor as a condition to imposition of the death penalty, the aggravating factor requirement functions as an element of

the offense. *Ring*, 536 U.S. at 597, 609; *see also Sattazhan v. Pennsylvania*, 537 U.S. 101, 111 (2003) (reiterating *Apprendi*'s principle that any fact that "increases the maximum punishment that may be imposed on a defendant . . . constitutes an element" of the offense). In addition, the Supreme Court has stated clearly that the Fifth and Sixth Amendments require that "any fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment*." *Jones*, 526 U.S. at 243 n.6 (emphasis added). Applying these principles to a prosecution under the Federal Death Penalty Act, we held in *Higgs* that *an indictment* for capital murder must contain at least one aggravating factor "[b]ecause only one statutory aggravating factor is required under the Act to render a defendant death-eligible." *Higgs*, 353 F.3d at 299; *cf. Wills*, 346 F.3d at 501 (stating that *Ring* does not require aggravating factors to be alleged in the indictment).

In this case brought under the Federal Death Penalty Act, the jury recommended the death penalty on Counts 7, 8, and 11 of the indictment. In recommending the death penalty on Counts 7 and 8, the jury found as a statutory aggravating factor for each that the government had proved beyond a reasonable doubt that Barnette committed the offense "in the expectation of the receipt of something of pecuniary value," thus justifying the jury's consideration of the death penalty for those counts. *See* 18 U.S.C. § 3592(c)(8). Barnette contends, however, that the indictment did not allege that statutory aggravating factor and therefore was deficient. We disagree. Count 7 of the indictment alleges that Barnette

> with intent to cause death or serious bodily harm, did knowingly, willfully and unlawfully take by force, violence and intimidation, that is, he shot to death and took from the person of Donald Lee Allen, a motor vehicle which had been shipped, transported and received in interstate or foreign commerce, that is, a 1994 Honda Prelude.

Donald Lee Allen's Honda Prelude represented a pecuniary gain to Barnette at least insofar as it provided him with transportation to Roanoke — transportation for which he would otherwise have had to pay. With respect to Count 8, our conclusion is the same, inasmuch as Count 8 explicitly incorporates Count 7.

In recommending the death penalty on Count 11, the jury found as a statutory aggravating factor that the government had proven beyond a reasonable doubt that Barnette committed the offense "after substantial planning and premeditation to cause the death of Robin Williams," thus justifying its consideration of the death penalty on Count 11. *See* 18 U.S.C. § 3592(c)(9).

Although the allegations in Count 11 of the indictment are not as explicit as those in Counts 8 and 9, they nevertheless provide adequate notice to Barnette that guilt was to be grounded on a finding of "substantial planning." Count 11 alleges that Barnette

> knowingly used and carried a firearm, that is, a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with the firearm willfully, deliberately, maliciously, and with premeditation.

Count 10, which was explicitly incorporated by reference into Count 11, alleges that Barnette

> did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her.

Although the words "substantial planning" are not used in either Count 10 or Count 11, that language must, as a fair construction, be read into the indictment. *See Hagner v. United States*, 285 U.S. 427, 433 (1932) (holding that an indictment can be upheld if "the necessary facts appear in any form, or by fair construction can be found

within the terms of the indictment"). Count 10 alleges that Barnette traveled from Charlotte to Roanoke "with the intent to injure" Williams. The planned trip was, we take notice, a three-hour journey of just under 200 miles. A fair construction of this allegation in the indictment, therefore, leads to the inevitable conclusion that Barnette planned his crime and planned to take the three-hour journey to commit it.

"[S]ubstantial planning and premeditation," as included in the statutory aggravating factor of § 3592(c)(9), means "'a higher degree of planning than would have the words 'planning and premeditation' alone — i.e., more than the minimum amount sufficient to commit the offense.'" *United States v. Jackson*, 327 F.3d 273, 301 (4th Cir. 2003) (quoting *United States v. Tipton*, 90 F.3d 861, 896 (4th Cir. 1996)). We believe that the allegations in Count 11 that incorporate the interstate domestic violence set forth in Count 10 effectively charge *substantial* planning and premeditation because the charged conduct included not only the minimum planning necessary to commit the crime but also the planning of a trip of 200 miles to commit it. Such planning, accompanied by the premeditation alleged in the indictment for a violation of 18 U.S.C. § 1111, therefore satisfies us that the indictment sufficiently alleged the statutory aggravating factor of "substantial planning and premeditation."

Moreover, if the statutory aggravating factors were inadequately alleged in the indictment, the deficiency was in any event harmless in the circumstances of this case. First, the indictment provided at least the factual structure from which the aggravating factors could have been found. Second, the government served Barnette with a formal notice of intent to seek the death penalty under 18 U.S.C. § 3593, in which the government listed the statutory aggravating factors that it intended to prove at the sentencing hearing. Accordingly, Barnette knew as to each capital count precisely what the government would seek to prove at his sentencing hearing. He cannot claim, even in the slightest, that the government ambushed his defense by attempting to prove previously unknown statutory aggravating factors at the sentencing hearing. Indeed, Barnette does not claim a lack of adequate notice. Because the indictment provides adequate notice and also can surely be pleaded as a defense of double jeopardy for any subsequent prosecution of the conduct for which he was found guilty in this case,

it is not constitutionally deficient. *See Russell v. United States*, 369 U.S. 749, 763-64 (1962).

In sum, we reject Barnette's argument that the indictment was deficient in failing to allege at least one aggravating factor as necessary to subject him to the death penalty. Alternatively, we conclude that any deficiency in the indictment that may have existed was, in any event, harmless in the circumstances of this case.

We concur in the other portions of Judge Widener's opinion — Parts I-III and V-XIV — and we concur in the judgment. Judge Michael has indicated that he joins in this opinion and in the judgment.

WIDENER, Circuit Judge, concurring in the result reached in Part IV:

I concur with the holding that the indictment is not so Constitutionally deficient as to merit reversal. While I agree with the result reached by the majority on this issue, I am of opinion that we must follow our circuit precedent in *United States v. Wills*, 346 U.S. 476, 501 (4th Cir. 2003), and that the other reasons relied upon by the majority, while relevant, are additional supporting reasons.

*Wills* is mentioned as a *cf.* reference in the majority opinion, which depends on *Higgs* for the contrary view, although *Higgs* was a subsequent decision to *Wills*, which, under our recent decision in *McMellon v. United States*, No. 02-1494 (4th Cir. 2004)(en banc), is the controlling authority. Without mentioning *McMellon* in its opinion, the majority follows the reasoning in Judge Niemeyer's dissenting opinion in *McMellon*, commencing at p.36 of that slip opinion, instead of the reasoning of the majority of the en banc court, commencing on p.4, Part II of the majority opinion, which is:

> "When there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting en banc or by the Supreme Court." (Slip, p.7) (Footnote omitted.)

My reasoning follows.

While ultimately rejecting Barnette's argument that the indictment was deficient in failing to allege at least one aggravating factor in order to subject him to the death penalty, the majority nevertheless follows the finding in *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003), that the indictment must allege at least one aggravating factor because one such aggravating factor is required by the Federal Death Penalty Act "to render a defendant death-eligible." *Higgs* at 299. The majority cites the holding in *United States v. Wills*, 346 F.3d 476, 501 (4th Cir. 2003), but fails to note that *Wills* was decided prior to *Higgs* and is, thus, the case to be followed on this issue.

Barnette contends that his death sentence is invalid under *Ring v. Arizona*, 536 U.S. 584 (2002), and the Indictment Clause of the Fifth Amendment because the indictment did not include the statutory aggravating factors that were submitted to the jury. In *Ring*, the Supreme Court confronted the question of whether the Sixth Amendment, made applicable to the States by the Fourteenth Amendment, requires an aggravating factor in a capital case to be found by a jury or by the judge. 536 U.S. at 597. As the Court noted, the question was narrow. The defendant, Ring, did not argue that his indictment was infirm. 536 U.S. at 597 n.4. Instead, Ring's claim was limited to the question of whether an aggravating factor which extends punishment beyond the statutory maximum must be found by a judge or by a jury.

The *Ring* Court determined that the jury must make that decision. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19). Barnette argues that *Ring* requires statutory aggravating factors in the Federal Death Penalty Act to be found not only by the sentencing jury but also by the grand jury and included in the indictment. I reject this contention.

*Ring* does not require that the statutory aggravating factors listed in 18 U.S.C. § 3592(c) be included in the indictment. *United States v. Wills*, 346 F.3d 476 (4th Cir. 2003), is a direct decision to this effect. *Wills* was the first case in which we considered this issue and is controlling. See *McMellon v. United States*, No. 02-1494 (4th Cir. Oct. 14, 2004) (en banc).

In *Wills*, the jury convicted Wills of kidnapping resulting in death and interstate stalking resulting in death. 346 F.3d at 481; see also 18 U.S.C. §§ 1201(a)(1) & 2261A. Section 1201(a)(1) provides for the death penalty if the kidnapping results in death to the victim. 18 U.S.C. § 1201(a)(1). At the conclusion of the sentencing hearing, the jury recommended a sentence of life imprisonment without parole, and the district court sentenced Wills in accordance with the jury's recommendation. *Wills*, 346 F.3d at 487. On appeal, Wills challenged his life sentence on the basis that the indictment failed to charge an offense that made Wills death-eligible. The *Wills* court rejected this argument.

> "The claim that the various aggravating factors had to be alleged in the indictment is not required by *Ring v. Arizona*, which does require, however that they be submitted to the jury, as they were in this case." 346 F.3d at 501 (internal citation omitted).

Thus, Wills received the automatic life sentence under 18 U.S.C. § 1201(a)(1) without reference to the Sentencing Guidelines.

As in *Wills*, the statutory aggravating factors in the instant case were submitted to and found by the sentencing jury. Each statutory aggravating factor was followed on the verdict form and explained by the district court in the jury instructions. The district court submitted two statutory aggravating factors to the jury on each capital count.

The district court complied with *Ring* by submitting the statutory aggravating factors to the jury. See *Ring*, 536 U.S. at 609; *Wills*, 346 F.3d at 501. The indictment tracked the language of the statutes that Barnette was accused of violating, contained the necessary factual elements that must be proven at trial, and was sufficient to bar a later prosecution for the same offenses. The government complied with all of the requirements at the time of the trial to obtain a capital indictment and to pursue a death sentence.

Congress has regulated the venue, jurisdiction, and procedure in the federal criminal courts since the Judiciary Act of 1789. See, especially, §§ 29, 30, and 33 of that Act, among others, relating to procedure. In my opinion, the Death Penalty Act of 1994, 18 U.S.C.

§§ 3591, et seq., which we examine here, is a valid exercise of Congressional authority. The district judge in this case complied literally and strictly with the Death Penalty Act. The defendant was given notice in the indictment of the crimes with which he was charged. The procedure which Congress prescribed in the Death Penalty Act was followed strictly and to the letter by the district court. In my opinion, the Death Penalty Act prescribing the procedure in death penalty cases was strictly followed, and the judgment of the district court should be upheld. I would not reach out for a Constitutional requirement, as has the majority, in a case such as this, that the procedural method enacted by Congress be added as a Constitutional requirement of an indictment. If the reasoning of the majority be valid, then does not the failure of Congress to require that the necessary death penalty factors be included in the indictment place a cloud upon the statute? I think not, but the majority apparently does.

Therefore, I am of opinion that in Part IV the majority has reached the correct result, but has relied on the wrong reason.

V.

Barnette argues that the Federal Death Penalty Act is unconstitutional under *Ring*. We review *de novo* a challenge to the constitutionality of a statute. See *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999). Initially, we presume that the statute is a valid exercise of congressional power. See *INS v. Chadha*, 462 U.S. 919, 944 (1983) ("We begin, of course, with the presumption that the challenged statute is valid. Its wisdom is not the concern of the courts; if a challenged action does not violate the Constitution, it must be sustained.").

Barnette claims that the Federal Death Penalty Act treats the aggravating factors required for the death penalty as sentencing factors that are charged by the United States Attorney rather than by the grand jury. Barnette contends that the courts applying the statute cannot comply with both *Ring* and the Federal Death Penalty Act because that statute does not require the statutory factors, which must be proven, to be included in the indictment, rather they are inserted into the case by the United States Attorney prior to trial.

One flaw in Barnette's reasoning is the assumption that the Federal Death Penalty Act precludes the grand jury from charging aggravating factors in the indictment. A review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent. And the fact that the government is not so restricted is no indication that such is required. *Ring*'s holding requires only that such aggravating factors, upon demand, be found by a jury instead of merely by a judge at sentencing.

"Congress has the power to proscribe rules of procedure for the federal courts, and has, from the earliest days, exercised that power." *Palermo v. United States*, 360 U.S. 343, 353 n.11 (1959). As we will develop below, the Federal Death Penalty Act is nothing more nor less than the action of Congress to insure that the procedure in the federal courts in the prosecution of a case involving the application of the death penalty complies with the Constitution. The statute does not make the application of its aggravating factors effective only after indictment for the particular factor, and we decline to imply such a requirement into the statute. As noted, the mere fact that the statute may permit an indictment to contain its aggravating factors is no indication that such is required of the indictment.

So far as the argument of Barnette may be that he is "charged by the attorney for the government alone, rather than by the grand jury," Br. p.63, we take that argument as a disagreement with respect to the requirement of § 3593(a) that "[i]f . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified," he shall give notice setting forth the aggravating factors the government will rely on to justify a sentence of death. If Barnette's complaint is that it leaves the choice of whether to seek the death penalty in the hands of the United States Attorney, we think that such a decision by Congress is not subject to review. Indeed, we have held that a decision on whether or not to prosecute by the General Counsel of the NLRB, on a subject of much lesser import, is not subject to review unless the claim is that the United States Attorney acted in excess of his delegated authority. *Associated Builders & Contractors, Inc. v. Irving*, 610 F.2d 1221, 1227-28 (4th Cir. 1979). In all events, it is our opinion that whether or not to seek a death sentence for a person who has committed a crime, especially when the exercise

of such discretions is authorized by Act of Congress, as here, is a power of the Executive not subject to judicial review.

In construing the validity of a federal statute, the Supreme Court has explained that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933) (citing *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)). The House of Representatives' report on the legislation that became the Federal Death Penalty Act stated that the purpose of the legislation was "to establish Constitutional procedures for the imposition of the Federal death penalty." H.R. Rep. No. 103-467 (1994). Those procedures must comport with the Supreme Court's ruling in *Gregg v. Georgia*, 428 U.S. 153 (1976), where the Court stated that a death penalty sentencing scheme may satisfy the Constitutional concerns outlined by the Court in *Furman v. Georgia*, 408 U.S. 238 (1972), if the statute is "carefully drafted" to "ensure[ ] that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195.

> As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of the sentence and provided with standards to guide its use of the information.

*Gregg*, 428 U.S. at 195. The Federal Death Penalty Act meets this standard, see 18 U.S.C. § 3591 *et seq., but it is not the sole statutory capital sentencing scheme which satisfies the Gregg* requirements. The *Gregg* case approved Georgia's capital sentencing procedures. See *Gregg*, 428 U.S. at 207. The Supreme Court also has approved the statutory sentencing schemes of Texas and Florida. See *Proffitt v. Florida*, 428 U.S. 242, 259-60 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976).[2] Virginia's capital sentencing procedure, which differs from

---

[2]In *Jurek*, as in *Gregg* and *Proffitt*, the most narrow opinion affirming the death penalty was written by Justice Stewart, joined by Justices Powell and Stevens. The Chief Justice and Justices White, Blackmun, and Rehnquist concurred in the judgment and filed various opinions and statements. Justices Brennan and Marshall dissented and filed dissenting opinions.

the federal Act, but which has aggravating factors similar to those approved in *Gregg* and *Jurek*, has also been held to be Constitutional. See *Smith v. Commonwealth*, 248 S.E.2d 135, 148-51 (Va. 1978), *cert. denied*, 441 U.S. 967 (1979).

Accordingly we are of opinion and hold that the Federal Death Penalty Act is valid. We particularly note that the statute *requires* trial by jury on demand for establishing the aggravating factors which must be found before a death sentence may be imposed. 18 U.S.C. §§ 3591-3593.

## VI.

Barnette contends that the district court removed prospective juror Campbell in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). In *Witherspoon*, the Supreme Court held that a death sentence cannot be imposed by a jury chosen by excluding those persons in the venire on the basis that they "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. The Supreme Court clarified the rules for excluding potential jurors based upon the jurors' views on capital punishment in *Wainwright v. Witt*, 469 U.S. 412 (1985), explaining that the standard for evaluating a potential juror's views is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 44 (1980)). We review the district court's removal of this venirewoman for abuse of discretion. *United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996).

On her jury questionnaire, venirewoman Campbell stated that "I disagree with capital punishment." At voir dire, she testified that she "wouldn't say it's a totally 100 percent disagree [with the death penalty], but I do lean in that direction quite a bit, maybe more than 50 percent, but not necessarily a hundred percent, if that makes sense." Juror Campbell then explained that she would not have a problem in considering the evidence and rendering a decision within the context of the law. Still later, she reverted back to explaining her views on the death penalty in terms of percentages:

I'm not saying 100 percent [against the death penalty]. I felt like in the past, or even maybe now, in my mind it leans, I'll just say percentagewise, maybe 55 or 60 percent, I don't 40 percent, I do — that sort of thing. But not a 100 percent. But I know there's always exceptions in any situation or, you know, given different forms of evidence. Well, in this case we're just deciding the sentence anyway. But, you know, there could be a number of factors that could pull the pendulum back the other way.

The district court sought to eliminate the ambiguity surrounding Campbell's statements:

THE COURT: Ms. Campbell, I was a little bit unclear about your degree of concern about the death penalty. I think a couple of times you indicated that it was something 55, 45. In other words, you leaned against imposing the death penalty something like 55 percent to 45 percent. Something along those lines.

PROSPECTIVE JUROR: Yes.

THE COURT: So that's kind of where you start. There's going to be a little bit of difference in which of the two penalties you could even consider before you heard any evidence; is that right?

PROSPECTIVE JUROR: Right.

Under questioning from the defendant's counsel, Campbell admitted that she was willing to listen to the evidence presented by both sides and consider both the evidence and the possible penalties before making a decision.

The government made a motion to excuse Campbell, and the district court granted the motion. Upon objection from Barnette's counsel, the district court explained its reasoning:

I think one has to make a judgment about the overall presentation of the juror. And in that case one is left with the firm

conviction that she would not give, as you all have been indicating, a level playing field. And that being the case, she was properly stricken.

* * *

There were several jurors early in the process who were stricken, not because they didn't give correct literal answers, if there is such a thing, but because the Court was convinced they could not give the defendant a fair trial.

In the case of this last juror, I believe that juror would not do likewise as to the government.

* * *

It was a combination. She twice came back to the well that in terms of her decision-making faculties, she would tilt in favor of not imposing one of the two options of sentence.

We find no abuse of discretion in the district court's decision to excuse veniremember Campbell. Campbell twice stated that she leaned against imposing the death penalty before even considering the evidence introduced at the sentencing proceeding. Her statements that she would apply the law equally without regard to the punishment options contradicted her earlier statements. In such a situation, precedent dictates that we look to the district court, whose analysis is presumed to be consistent with the standards established in *Witherspoon* and *Witt*. See *Maynard v. Dixon*, 943 F.2d 407, 415 (4th Cir. 1991) ("Moreover, it has been established in this court that where the prospective juror's response, as captured in the transcripts, reflects some ambiguity in the state of mind of the juror, then the determination made by the trial court, based on its eyeing of the juror, is presumed to be consistent with the standard.") (citing *Briley v. Bass*, 750 F.2d 1238, 1246-47 (4th Cir. 1984)); see also *Truesdale v. Moore*, 142 F.3d 749, 757 (4th Cir. 1998). The district court reached its decision after seeing the juror and hearing her testify. Accordingly, we are of opinion and decide that the district court did not abuse its discretion.

Barnette argues that the district court erred when it refused to remove venireman Donaldson. Barnette centers his argument on the holding in *Morgan v. Illinois*, 504 U.S. 719 (1992), that a defendant may challenge for cause any prospective juror who will disregard the evidence presented at trial and the trial court's instructions and "automatically vote for the death penalty in every case." 504 U.S. at 729. We review the district court's decision to deny Barnette's motion to excuse Donaldson for abuse of discretion. See *Tipton*, 90 F.3d at 880.

Barnette contends that Donaldson's testimony during voir dire revealed that Donaldson favored the death penalty and did not have an open mind as to deciding between a sentence of life in prison or death. At voir dire, Donaldson testified in response to the district court's question about his statement in the jury questionnaire that he "supported the death penalty" by stating that "I [Donaldson] don't think that's the right interpretation, at least if I was answering questions the way I intended." The district court agreed with Donaldson that the questions in the jury questionnaire were confusing and allowed the attorneys on both sides to ask further questions:

By the government—

Q.  And I think the Court asked you [sic] little bit — we had a series of "always" and "never" questions on the questionnaire that were somewhat difficult to understand, although you've noted you would never vote to impose the death penalty, I would take that to be a mistake?

A.  The way I interpreted the question was whether or not you would always vote to impose it.

Q.  Okay. And what are your thoughts about that?

A.  And no, I would not always vote. I think it's too tough to put an absolute on. But it was the general saying I do support it.

\* \* \*

Q. In this case you haven't — you've heard facts from the court that will give you a factual background but you haven't heard any evidence of aggravating or mitigating factors at this point. Would you say that at this point in this case you have an open mind about either the death penalty or life imprisonment without release as possible punishments?

A. Probably not a hundred percent. Just based on the comments of the Judge and the fact we're here today.

Q. Now, it would be important for you to set aside any opinions you may have formed based [on] that factual basis and to come into this proceeding with an open mind. And we all come into the courtroom with life experiences and opinions, and we don't ask you not to have any when you come in, but we ask you, if possible, to set aside opinions that you may have formed and wait to make your decision in the case based on the evidence you will hear in the courtroom. Would you be able to do that?

A. I think so.

Q. And as I sometimes say, the defense and the government want folks to come in here on an even keel, even playing field, not to come in with predetermined viewpoints about things and it would be important for you to be able to do that. Are you saying that you can do that?

A. I think I can.

* * *

By the defense —

Q. What do you think of the sentence of life imprisonment without the possibility of release as a punishment for two first degree murders?

* * *

A.  I'm not sure if I've got a real opinion on it. You mean in contrast to the other possibility? Again supporting the death penalty, I'm not sure that it's an adequate punishment.

Q.  That's fair enough. You mentioned your approval, you're [sic] belief in the death penalty, your support for it is based on social issues. Could you elaborate on that, please?

A.  I guess it's — I view it as less a punishment for past crime and more as an important deterrent for future ones.

* * *

By the government —

Q.  Are you able to consider at this point having heard none of the evidence both of those options [life in prison and the death penalty]?

A.  I certainly would make every effort to put any preconceived notions I got today aside to do that.

Q.  And today you wouldn't automatically vote one way or the other?

A.  No.

* * *

By the defense —

Q.  You have told Ms. Tompkins [attorney for the government] several times that you would try your best to set aside your feeling that you developed once you heard

the fact situation in this case and only know whether you can do that. None of us can tell you. And if you had any concerns or any reservations about your ability to consider both punishments on these facts, this is the time, consistent with your oath as a juror, to tell us that. Do you?

A.   No, I don't have any specific concerns. I've never been in this exact situation before, so it's difficult. I can't say with 100 percent certainty. I'd like to think I could put that aside.

Q.   And I hope you understand I'm not trying to belabor the point, but there's still some equivocation there. And that's very difficult for us of [sic] going into this process selecting a jury with someone who has some reservation, if that's what it is. I'm not sure that's what you're expressing.

A.   I wouldn't call it reservation. I believe — I think I can do it.

* * *

Q.   Knowing what you know and feeling the way you feel, do you think you are able to engage in that process and give meaningful consideration to a sentence of life imprisonment without possibility of release?

A.   Yes, I think so.

Q.   Do you have any reservations about your ability to do that?

A.   No, I don't have any reservations.

Despite his initial statements on the jury questionnaire form stating that he favors the death penalty, Donaldson's testimony at voir dire, under questioning by the attorneys for both the government and the

defense, was evidence which tended to show his ability to consider both sentencing options and his lack of reservation about considering either penalty. Whereas Miss Campbell indicated that she would begin the proceeding 55 percent in favor of life imprisonment, Donaldson stated after questioning by defense counsel that he would have no reservation in giving meaningful consideration to the sentence of life imprisonment and would not begin by automatically being in favor of one sentence over the other. Again, in this situation, great deference is due to the district judge who saw Donaldson testify and heard his testimony. See *Tipton*, 90 F.3d at 880 (upholding the exclusion of potential jurors who "expressed reservations, never retracted, sufficient to warrant the district court's determination that they would substantially impair the juror's performance of duty to vote for the death penalty if the evidence and law so dictated"); *Briley*, 750 F.2d at 1246-47. We are of opinion and decide that the district court did not abuse its discretion in denying Barnette's motion to excuse venireman Donaldson.[3]

## VII.

Barnette claims that the district court erred in overruling his *Batson* challenge to the government's use of peremptory challenges on five black potential jurors. See *Batson v. Kentucky*, 476 U.S. 79 (1986). Under the *Batson* doctrine, a prosecutor may not exercise a peremptory challenge to a potential juror solely on the basis of the prospective juror's race or on the assumption that black jurors as a group will be unable impartially to consider the state's case against a black defendant. 476 U.S. at 89. In order to demonstrate a *Batson* violation, a defendant must establish a prima facie case of discrimination using the following three-part test:

> (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an

---

[3]As we did in *Tipton*, we have applied in this federal death appeal cases referring to the authority and discretion of the trial judge in our habeas review of convictions in state courts.

inference that the prosecutor discriminated in his or her selection of the jury pool.

*Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998). If a defendant establishes a prima facie case, the burden shifts to the prosecutor to provide a non-discriminatory reason for the peremptory challenges used in selecting the jury. 162 F.3d at 271. Once the prosecutor presents the district court with a non-discriminatory reason for using a peremptory challenge, the district court must determine whether the defendant has proven intentional discrimination. 162 F.3d at 271 (citing *Batson*, 476 U.S. at 97). We review for clear error a challenge to the district court's rulings as to whether a challenge was exercised for a racially discriminatory reason. *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995). We accord great deference to the district court's ruling on such a *Batson* challenge. *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998).

Barnette, who is black, challenged the government's use of a peremptory challenge to strike prospective juror Bryson from the jury panel. When the district judge asked the government for its reason for striking the potential juror, the attorney for the government stated that "[i]n this particular juror's case, on the questionnaire she noted that her personal view of the death penalty wavers; and that she was not sure whether she favored abolishing the death penalty; and marked on the questionnaire that she was uncertain about how she felt on the death penalty. In questioning, she called herself, quote, a straddler. And again, said that she was uncertain about how she felt about the death penalty." For those reasons, the government sought to strike Mrs. Bryson from the jury. The government's reason for exercising a peremptory challenge does not need to rise to the level of a challenge for cause; it must be, however, a clear and reasonably specific statement of the reasons for exercising the challenge. *United States v. McMillon*, 14 F.3d 948, 952 (4th Cir. 1994).

The district court upheld the government's peremptory challenge and removed the prospective juror. We find no clear error in this decision. Under *Brown v. Dixon*, 891 F.2d 490, 497-98, esp. n.15, (4th Cir. 1989), the government may use a peremptory challenge to strike a juror who has reservations about capital punishment. *Brown* teaches that while the government's reason does not support a challenge for

cause under *Witherspoon*, it can still be used as the basis for a peremptory strike. *Brown*, 891 F.2d at 497.

*Brown* also applies to another juror who Barnette claims was struck on the basis of her race. The government exercised a peremptory challenge to strike prospective juror R. Sanders on the grounds that she had concerns with the fairness of the death penalty, strong feelings about unfairness of its application because of socioeconomic, race and age factors, and was not sure that she could be fair. The district court concluded that this was a race-neutral reason for exercising the peremptory challenge, and we find no clear error in the district court's analysis. Under *Brown*, the government may utilize a peremptory challenge to strike a prospective juror if the prospective juror has expressed reservations about the death penalty, much less the feelings expressed by venirewoman Sanders.

Barnette contends that the government used a peremptory challenge to strike prospective juror Moore on the basis of her race. Among the government's non-discriminatory reasons for striking Moore was that she hesitated before answering a number of questions; in particular, the government stated that "there was a very long hesitation before she could tell me whether the government was on an equal playing field." The government also stated that it sought to strike Moore because she indicated that she did not know if she would be willing to go against her religious views regarding the death penalty. The district court found these reasons to be race-neutral, and we agree. The district court specifically noted Moore's "religious bent against the death penalty" as a reason supporting the government's decision to strike her. We conclude that there was no clear error in this decision. See *Batson*, 476 U.S. at 89, noting that peremptory strikes may ordinarily be exercised "'for any reason at all, as long as that reason is related to [the government's] view concerning the outcome' of the case to be tried." And the district court's decision obviously comes within the reasoning of *Brown*, n.15, as we have previously held in this case.

Next, Barnette challenges the government's use of a peremptory strike on prospective juror K. Sanders. As a race-neutral reason for the peremptory strike, the government stated that her responses on her questionnaire revealed a hesitancy in her ability to consider the death

penalty and that questioning during voir dire showed Sanders to be non-communicative with the government. The government also noted that Sanders hesitated for a long period before answering a question on her opinion on the death penalty. The district court found these reasons to be non-discriminatory. We agree. See *Brown*, 891 F.2d at 497-98. The government may exercise a peremptory strike on the basis of several factors, including employment, both past and present, appearance and demeanor of the potential juror, and the absence or presence of apparent prejudice. See *United States v. Grandison*, 885 F.2d 143, 149 (4th Cir. 1989).

The government also exercised a peremptory strike to remove prospective juror Blakeney from the jury. Barnette contends that this strike was done on the basis of race. When asked by the district court to state a non-discriminatory reason for striking Blakeney, the government noted that Blakeney had "a great hesitancy in responding to questions," and that he said, "I don't want to sentence anyone to death." The government also explained to the district court that Blakeney indicated on his juror questionnaire that he was uncertain about how he felt about the death penalty. The district court found that the government's explanation was race-neutral and denied Barnette's *Batson* challenge.

We find no clear error in the district court's ruling. *Brown* establishes that the government may move to strike a potential juror who has reservations about the death penalty. See *Brown*, 891 F.2d at 497-98. On that basis, the government can exercise a peremptory challenge. See *Brown*, 891 F.2d at 497.

During voir dire, Barnette's counsel argued that the "cumulative effect" of the government's use of peremptory strikes against prospective black jurors violated *Batson*. The district court rejected this argument, which is not repeated on appeal, and we do not disagree with the district court's ruling. As an apparent extension of this argument, however, Barnette contends, for the first time on appeal, that the government violated *Batson* by exercising peremptory challenges on prospective black jurors for stated reasons, yet not striking two white venirepersons who made statements that the defendant claims were similar to those made by the prospective black jurors.

Two Fourth Circuit cases have addressed this same contention. In *Howard v. Moore*, 131 F.3d 399, 408 (4th Cir. 1997) (en banc), and *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997), the court explained that "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not." The *Matthews* court instructed that

> [t]his is so because counsel must be entitled to make credibility determinations in exercising peremptory challenges. Indeed
>
> > counsel is entitled to take account of the characteristics of the other prospective jurors against whom peremptory challenges might be exercised; to reevaluate the mix of jurors and the weight he gives to various characteristics as he begins to exhaust his peremptory challenges; and to take into account tone, demeanor, facial expression, emphasis — all those factors that make the words uttered by the prospective juror convincing or not.

*Matthews*, 105 F.3d at 918 (quoting *Burks v. Borg*, 27 F.3d 1424, 1427 (9th Cir. 1994), *cert. denied*, 513 U.S. 1095 (1995)).

The cases cited by Barnette, *Ford v. Norris*, 67 F.3d 162 (8th Cir. 1995), and *Turner v. Marshall*, 121 F.3d 1248 (9th Cir. 1997), are not persuasive although they mention the same subject. In *Turner*, the court distinguished *Burks* and found that the prosecutor had advanced no "legitimate justification for the challenge," a condition not present here. In *Ford*, "the record simply offer[ed] no support whatsoever for the prosecutor's stated reasons for striking Jurors Billops and Tally," and the *Ford* prosecutor had stricken "every black venireperson who was called to the jury box to serve," neither a condition present here.

Great deference is due to the district court's finding, for the judge observed the government's handling of all of its peremptory strikes and asked his own questions during voir dire. See *Grandison*, 885 F.2d at 146.

And an overall picture of the government's strikes may be helpful. As the *Grandison* court noted, "the fact the jury included two black jurors is significant." 885 F.2d at 147. Barnette's jury included two black jurors, and one black alternate. "This is especially [significant] where, as here, the government could have used a remaining strike against those jurors but three times declined to do so." *Grandison*, 885 F.2d at 147. In the case at hand, the government used only 11 of its 20 peremptory strikes. See Fed. R. Crim. P. 24(b)(1) ("Each side has 20 peremptory challenges when the government seeks the death penalty."). Of those 11 peremptory strikes, six were used on blacks. One black potential juror was passed to the defense, and the defense exercised a peremptory challenge to strike that juror. The government used both of its peremptory strikes on the alternates, striking one black prospective juror. The government used its peremptory strikes in the following manner: 1) a white female; 2) a black female, Bryson; 3) a black female, R. Sanders; 4) a white male; 5) a white female; 6) a black female, Moore; 7) a white female; 8) a black male;[4] 9) a black female, K. Sanders; 10) a black male, Blakeney; and 11) a white male. As to the alternates, the government first struck a black female[5] and then a white female. The government did use both of its peremptory strikes during the selection of the alternate jurors, but, of the four alternates selected, one was black.

We find no error in the district court's rulings on Barnette's *Batson* challenges.[6]

## VIII.

Barnette contends that the government's presentation of victim impact evidence violated the Federal Death Penalty Act and the Constitution. Barnette acknowledges in his brief that he raised a similar argument in his first appeal and that this court rejected his conten-

---

[4]The defense did not raise a *Batson* challenge regarding the striking of this juror by the government.

[5]Barnette did raise a *Batson* challenge to the strike of this alternate juror during jury selection. However, he has not pursued that objection on appeal.

[6]It is also of note that the defense only used 15 of its 20 peremptory strikes.

tions: ". . . [M]uch of it [the evidence] the same as had been intro-
duced the first time." Br. p.83. See *Barnette*, 211 F.3d at 817-19. To
the incidents considered in the first trial, Barnette now adds two tak-
ing place at the second trial. First, he objects to the introduction of
several photographs of Miss Williams during the testimony of Mrs.
Williams and Kenneth Williams, Miss Williams' brother. Second,
Barnette contends that the district court erred in allowing an outburst
by Mrs. Williams into evidence.[7] Title 18, Section 3593(a)(2) pro-
vides that "the effect of the offense on the victim and the victim's
family" may be considered as a factor in imposing the death sentence.
As we noted in *Barnette*, the Court has determined that the admission
of victim impact evidence is not an automatic violation of the Eighth
Amendment to the Constitution. See *Payne v. Tennessee*, 501 U.S.
808, 827 (1991), *cited in Barnette*, 211 F.3d at 817. Barnette now
argues that the presentation of victim impact evidence at his sentenc-
ing hearing violated *Booth v. Maryland*, 482 U.S. 496 (1987), *over-
ruled in part*, *Payne v. Tennessee*, 501 U.S. 808 (1991), the Eighth
Amendment, and the Federal Death Penalty Act.

   In *Booth*, the Supreme Court reviewed a victim impact statement
introduced into evidence at a sentencing hearing in a capital case. It

---

[7]Mrs. Williams' statement about which Barnette objects follows:

| | |
|---|---|
| Mrs. Williams: | I didn't get to tell her good-bye. She was the joy of my life. Marc knew she was the joy of my life. The only little girl I had. The only little girl I had. |
| | You knew that, Marc. You took her life. Took away her future. You know how much she meant to me. |
| Ms. Tompkins: | Ms. Williams . . . Ms. Williams, that morning do you remember praying? |
| Mrs. Williams: | How could you do that, Marc? |
| Ms. Tompkins: | May I approach? |
| Mrs. Williams: | How can you kill my baby? Why you kill (sic) my baby, Marc? She loved you, you know that. She never mistreated you, Marc. |
| | I'm sorry. I'm sorry. I'm sorry. I apologize. I apologize. |

vacated the sentence and remanded. A Maryland statute required that the victim impact statement be considered by the jury. Pursuant to the statute, the Maryland State Division of Parole and Probation prepared the victim impact statement in *Booth* using interviews with the victims' son, daughter, son-in-law, and granddaughter. 482 U.S. at 498-99. The prosecutor then read the victim impact statement to the jury during the penalty phase of the capital trial. 482 U.S. at 501. The victim impact statement included descriptions of the emotional and personal problems faced by the victims' family as a result of the crimes. The Court held that the Eighth Amendment restricts a jury from considering both types of information in a capital case; first, the emotional trauma suffered by the family and personal characteristics of the victim; and second, family members' opinions and characterizations of the crimes.

The Supreme Court overruled *Booth* in *Payne* to the extent that *Booth* held that "evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing."[8] *Payne*, 501 U.S. at 830 & n.2; see *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998) ("*Payne* did not overrule the prohibitions in *Booth* against the admission of 'information concerning a victim's family members' characterization of and opinions about the crime, the defendant, and the appropriate sentence.'") (quoting *Payne*, 501 U.S. at 835 n.1 (Justice Souter, concurring)). *Payne* also explained that victim impact evidence is subject to the constraints of the Due Process Clause of the Fourteenth Amendment, and evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair" is inadmissible. See *Payne*, 501 U.S. at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986)).

Accordingly, we review the district court's decision to deny Barnette's motion for a mistrial following Mrs. Williams' statements and

---

[8]The specific issue upon which the Supreme Court granted certiorari in *Payne* was "to reconsider our holdings in *Booth* and [*South Carolina v.*] *Gathers* [490 U.S. 805 (1989)] that the Eighth Amendment prohibits a capital sentencing jury from considering 'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne*, 501 U.S. at 817.

to admit the photographs of Miss Williams into evidence to ensure that the district court's decisions conformed with the portion of *Booth* left intact after *Payne* and with the due process requirements of the Fourteenth Amendment. We review the district court's denial of a motion for a mistrial for abuse of discretion. *United States v. Stockton*, 349 F.3d 755, 762 (4th Cir. 2003). Rulings by the district court as to the relevance of evidence are subject to review for abuse of discretion.

Turning first to the photographs of Miss Williams, *Payne* allows the admission of evidence about the impact of the crime upon the family of the victim. 501 U.S. at 827. After Barnette objected to the admission of 26 photographs the government was considering using during the sentencing hearing, the district court ruled that

> In terms of the probative value of the photographs, they're all appropriate. The government may offer them to show the phases of the victim's life. It does seem that there may be some duplication in there that's unnecessary, so I think the government should be cognizant of that. But in terms of the numbers, a great many of them simply show the same thing and are therefore unnecessary. But they're also for that reason not inflammatory or otherwise prejudicial to the defendant. So the court will allow the photographs.

The government then proceeded to introduce 13 of these photos during the testimony of Mrs. Williams and Kenneth Williams. The government introduced these photos to explain to the jury the impact of the murders upon the Williams family. The photos accompanied testimony by Mrs. Williams and Kenneth Williams about their relationship with Miss Williams. The district court noted, and we agree, that none of the photos were "inflammatory or otherwise prejudicial."[9]

---

[9]The thirteen photos included a baby picture of Miss Williams, a picture of Miss Williams as a small girl with her friends, a kindergarten picture of Miss Williams, a kindergarten graduation picture, an elementary school picture, a picture of Miss Williams' first haircut, a picture of Miss Williams' graduation from ECPI Technical College, a picture of Miss Williams working in a hospital, a picture of Miss Williams and her dog, a picture of Miss Williams with her niece, a high school picture, a picture of Miss Williams on her brother's motorcycle, and a Williams family portrait.

The use of these photos comports with *Payne* because the government introduced the photos not for the purpose of presenting Mrs. Williams and Kenneth Williams' opinions on Barnette or the appropriate penalty but in order to give context to the loss inflicted on the Williams family by the murder. See *Payne*, 501 U.S. at 827.

The photos also do not offend the Due Process Clause of the Fourteenth Amendment. To violate the Due Process Clause, the photos must be of "sufficient significance that it denies the defendant the right to a fair trial." *Barnette*, 211 F.3d at 818 (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)). The admission of the 13 photos did not violate that standard. The photos presented the jury with a glimpse of Miss Williams' attributes and characteristics cherished by her family. The district court did not err in determining that the photographs were admissible as victim impact evidence. We add that, as to the photographs, sufficient objection was made under Rule 103.

During her testimony, Mrs. Williams became upset and made the statement shown above in footnote 7. Several days after the statement, the defendant filed a motion for a mistrial based on the statement. The district court denied the motion. We hold that the district court did not abuse its discretion in so ruling. Mrs. Williams' statement did not offer "characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Payne*, 501 U.S. at 830 n.2. Instead, Mrs. Williams described the trauma that she has suffered due to the murder of her only daughter. Mrs. Williams commented on the crime by describing the loss she suffered, a type of evidence permitted by *Payne*. She offered no opinion on Barnette, the horrible nature of the actual murder, or her view of what sentence would be appropriate for Barnette. Her statement did not violate *Booth*'s surviving holding. See *Booth*, 482 U.S. at 508-09 (prohibiting victim impact evidence that presents the victim's family members' opinions as to what conclusions the jury should arrive at).

Nor did Mrs. Williams' statement violate Barnette's right to due process. Given the strong evidence of the brutal nature of Miss Williams' murder, we are of opinion that Mrs. Williams' few sentences do not rise to the level of being "so unduly prejudicial that [they] render[ ] the trial fundamentally unfair." *Payne*, 501 U.S. at 825. As the *Payne* Court noted, "courts have always taken into consideration the

harm done by the defendant in imposing sentence, and the evidence adduced in this case was illustrative of the harm caused by Payne's double murder." 501 U.S. at 825.

Barnette's last argument with regard to victim impact evidence is that 18 U.S.C. § 3595 requires that we invalidate Barnette's death sentence because the "sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(2)(A). The defendant's argument that Mrs. Williams' statement inflamed the jury to act under the influence of passion or prejudice is without merit. See *Payne*, 501 U.S. at 832 ("[S]urely this brief statement did not inflame [the jury's] passions more than did the facts of the crime . . . .") (Justice O'Connor, concurring); *United States v. Bernard*, 299 F.3d 467, 480-81 (5th Cir. 2002) (explaining that brief statements that may violate *Booth* "did not alone unduly prejudice the jury"). Furthermore, the district court instructed the jury on each capital count in engaging in the weighing process not to be swayed by any passion, prejudice, or undue sympathy for either side. See *Bernard*, 299 F.3d at 481 (noting the court's presumption that the jurors at Bernard's trial followed the district court's instructions to not be swayed by passion or prejudice); *Hinkle v. City of Clarksburg*, 81 F.3d 416, 427 (4th Cir. 1996) ("Juries are presumed to follow instructions provided them."); *United States v. Francisco*, 35 F.3d 116, 119 (4th Cir. 1994). We are of opinion that Mrs. Williams' brief statement did not lead the jury to impose the death penalty in violation of 18 U.S.C. § 3595(c)(2)(A), particularly when the grim facts of the murders are taken into account.

We add that at the time of the outburst by Mrs. Williams, no objection was made and the motion for a mistrial came several days later. The attorneys for Barnette were skilled and attentive, and even if the lack of contemporaneous objection does not reduce the grade of error to application of the plain error rule, as it probably does, at the very least it shows that at the time the outburst was made, no one in the courtroom considered it out of line. The district court in this case tried every aspect of the case with exacting detail, and had there been such as is now claimed error, it undoubtedly would have instructed the jury to pay no attention to Mrs. Williams' outburst. To her credit, the Assistant United States Attorney apparently intervened, which may well have been the action that interrupted Mrs. Williams.

We are of opinion there was no error in the respect claimed, much less plain error.

IX.

The jury found under 18 U.S.C. § 3592(c)(9) that Barnette "committed the offenses" in Count Seven, 18 U.S.C. § 2119(3) (car jacking); Count Eight, 18 U.S.C. §§ 924(c)(1) and (i)(2)(l) (first degree murder by use of a firearm); and Count Eleven, 18 U.S.C. § 924(c)(1) and (i)(2)(l) (first degree murder by use of a firearm) "after substantial planning and premeditation to cause the death[s]" of Allen, Counts Seven and Eight, and Robin Williams, Count Eleven.

Barnette argues that the substantial planning and premeditation aggravating factor was applied in error. He argues that the evidence showed that he did not plan to kill Allen but only to take Allen's vehicle. Likewise, Barnette argues that the evidence indicated that he intended to confront Miss Williams but did not know what was going to occur during the confrontation. Barnette makes the additional argument that the jury instructions regarding the substantial planning and premeditation aggravating factor may have confused the jury into believing that, to find the substantial planning and premeditation aggravating factor, the jury only had to find that Barnette planned to commit the carjacking and to commit an act of interstate domestic violence instead of finding that Barnette showed planning and premeditation to kill Miss Williams and Allen.

Barnette's challenge to the sufficiency of the evidence to support the planning and premeditation aggravating factor must overcome a heavy burden. We view the evidence in the light most favorable to the government and make all inferences and credibility determinations in the government's favor. "The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942).

When viewed under this standard, the evidence against Barnette was more than sufficient to support the jury's finding that Barnette murdered Miss Williams and Allen with premeditation and after planning the crimes. Regarding Allen's murder, Barnette argues the fact

that he testified at the sentencing hearing that he "didn't really have a formulation plan (sic), just to get a car" and that he was not thinking about what he was doing when he carjacked and murdered Allen. A look at Barnette's testimony, however, lends support to the jury's conclusion. Of particular importance was Barnette's testimony that during the weeks prior to the murders he collected items that would be useful in the execution of his plan. Barnette obtained a crowbar, bolt cutters, shotgun shells, and a shotgun, which he modified by sawing off the barrel and attaching a flashlight to the barrel. Barnette further altered the flashlight by coating the lens with a red marker.

To begin his trip to Roanoke, Barnette walked about one mile to the intersection of Billy Graham Parkway and Morris Field Road. Once at the intersection, at night, he laid in wait hiding in the bushes and loaded his shotgun. Barnette's actions reveal the planning and premeditation that went into arming himself with a shotgun and walking to and hiding at his chosen killing place.

Allen had stopped his car at the traffic signal at Billy Graham Parkway and Morris Field Road when Barnette approached the car and, at the point of the shotgun, demanded that Allen exit his car. When Allen got out of his car, instead of merely taking the car, as now claimed to be his sole purpose, Barnette walked Allen across Morris Field Road, at least three, and possibly five, lanes for travel, and down a drainage ditch for a way, during which time he robbed Allen of his money. After the robbery of the money, Barnette shot and killed Allen with the shotgun he had sawed off. The photograph of Allen's body indicates a secluded location in the ditch. He then used Allen's money to purchase gas for Allen's car, which he seized and drove to Roanoke to murder Miss Williams.

The jury chose to disregard Barnette's self-serving testimony that he did not plan to kill Allen. See *United States v. Parsons*, 993 F.2d 38, 41 (4th Cir. 1993). We are of opinion that the government presented ample evidence for the jury to reach this conclusion.

Turning to the murder of Miss Williams, even Barnette's own testimony is evidence which tends to defeat his argument that he did not act with planning and premeditation in killing Miss Williams. During direct examination, Barnette was asked about the day of the murder:

"Was this the day Robin was going to die?" "Yeah," Barnette responded. Thus, Barnette's own testimony revealed his intention to murder Miss Williams. Accompanying this declaration, the jury also considered the evidence that Barnette purchased the shotgun, altered and modified the shotgun, and obtained bolt cutters, shotgun shells, and a crowbar, gathering these items in a bag he used when he went to see Miss Williams. Barnette stated that during the period of a week or a week and a half after he bought the shotgun, he "thought about going to Roanoke and killing Robin and killing myself." He hid the shotgun in his home during this period. Before entering Miss Williams' house, Barnette waited outside until he saw Miss Williams, and he then cut the phone lines to prevent a telephone call for help. He even had the wire cutters in his pocket to cut the phone line. Barnette specifically testified that he cut the phone lines because he "didn't want anyone to stop me." As he approached the door to Miss Williams' house, Barnette fired the shotgun at the dead bolt in order to enter the residence. So Barnette's actions in the days and weeks before the murders are evidence that the murders were deliberately planned. We are of opinion that the jury had ample evidence from which it could conclude that Barnette utilized substantial planning and premeditation in preparing his attack on Miss Williams, and the jury was free to disregard Barnette's self-serving testimony that he didn't know what was going to happen once he reached Mrs. Williams' residence. See *Parsons*, 993 F.2d at 41.

We thus affirm the judgment of the district court that there was substantial evidence to support the verdict that Barnette committed the offenses in Counts Seven, Eight and Eleven after substantial planning and premeditation to cause the deaths of Allen and Miss Williams.

Barnette next advances the argument that the district court erred in responding to a question from the jury regarding the substantial planning and premeditation aggravating factor. We review *de novo* the legal question of whether a district court has correctly instructed a jury on the statutory elements of a crime. See *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996).

During deliberations, the jury asked the following question in a handwritten note to the court:

*"to" cause the death* — does this mean he planned the car-jacking *to cause the death*

or are we considering wether [sic] he planned the carjacking "*which*" caused the death

(emphasis in original). The defendant contended that the district court should have instructed the jury that "The only thing that you can consider is that it was to cause the death." (A.2019). The district court denied the defendant's request. The district judge responded to the jury by directing that they reread their instructions which provided, in pertinent part:

Now, the second aggravating factor the government contends for is that the defendant committed the offense of carjacking resulting in death as charged in Count 7 after substantial planning and premeditation to cause the death of Donald Lee Allen.

This jury instruction tracks, letter for letter, the statute involved in this case, 18 U.S.C. § 3592(c)(9), which is in full:

(9) Substantial planning and premeditation.—

The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism.

We especially note that the operative part of that statute is the same as the instruction, which is " . . . after substantial planning and premeditation to cause the death of Donald Lee Allen." Not only does the instruction track the statute word for word, we have construed in *United States v. Tipton*, 90 F.3d 861, 896-97 (4th Cir. 1996), a similar, if not the same, aggravating factor for homicide in 21 U.S.C. § 848(n)(8), which is: "The defendant committed the offense after substantial planning and premeditation." In *Tipton*, the defendant and others had visited the apartment of one Moody because Moody was a rival drug dealer, and following an apparent shooting match, Moody was killed while escaping after being wounded. The contention was

that the conduct of one Roane, in killing Moody when he fled, was unplanned and spontaneous, but we construed that statute as follows:

> But of course the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane.

The district court in the case at hand answered the question as "whether the offense happened after, or in consequence of, substantial planning and premeditation." We are of opinion there is no significant difference in the construction given to the aggravating factor in *Tipton* and the construction placed on the aggravating factor in this case.

Barnette not only walked a long way to get to the intersection involved, he hid there in the weeds, awaiting some motorist to stop; he did not merely take the car, he walked Allen across a multi-lane highway, and after crossing the road, robbed Allen of his money; after the robbery of the money, Barnette then took Allen to a secluded place in a drainage ditch and killed him; having had no money, he took Allen's money, bought gasoline for Allen's car, then drove the stolen car to Roanoke, to kill Miss Williams.

We are thus of opinion that there was substantial evidence for the jury to find that Barnette "committed the offense after substantial planning and premeditation to cause the death of [Allen]."

We are further of opinion there is no essential difference between the instructions given by the district court in this case, that the offense happened in consequence of substantial planning, etc., and our opinion in *Tipton*, that the murder was the result of substantial planning and premeditation.

With respect to the fact that the same aggravating factor, substantial planning and premeditation to cause the death of Robin Williams, was found for Count Eleven, the defendant complains that the verdict is not supported by the evidence. This is the contention:

> With respect to Robin Williams' death, there was considerable evidence that Mr. Barnette planned to find Ms. Wil-

liams and confront her, but to what end? What was the intended result of the confrontation? Mr. Barnette testified that he 'didn't know what was going to happen.' J.A. 1113. 'I had fantasies of taking her with me, having her tell me it would be okay, taking me to find Bennie. I had so much stuff running through my mind, there is — it's just never one thing to pinpoint.' J.A. 1117. He further testified that he was trying to get Robin in the car, they were arguing, she reached for the gun, and he shot her. See Statement of the facts, sub-section 2, f, supra. This does not constitute 'substantial planning and premeditation' to kill, and in the absence of any other evidence from which a rational trier of fact could infer such planning, this finding must be set aside.

Again, Barnette's complaint is that the jury must have accepted his testimony. We are of opinion the jury was quite justified in rejecting it and that substantial evidence of the planned death of Miss Williams was introduced, which showed that that crime was deliberately planned and prepared for days and weeks leading up to the killing. No further discussion of that point is justified.

## X.

The jury found that Barnette "committed the offense[s] in Count[s] Seven [and Eight] in the expectation of the receipt of something of pecuniary value," a statutory aggravating factor under 18 U.S.C. § 3592(c)(8). Barnette contends that the district court committed error in instructing the jury on this factor because it does not apply to robberies. Barnette did not raise this claim before the district court, and we review Barnette's contention for plain error. See *United States v. Hastings*, 134 F.3d 235, 239 (4th Cir. 1998). Barnette must show that an error occurred, that the error was plain, and that the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993).

At the sentencing hearing, the district court instructed the jury on the pecuniary gain aggravating factor in the following manner:

    Now, the first aggravating factor contended for by the government is the defendant committed the offense in Count

7 in the expectation of the receipt of anything of pecuniary value, namely, a Honda automobile and Donald Lee Allen's wallet and money.

To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove unanimously and beyond a reasonable doubt in essence that the defendant committed the offense in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

There's no requirement that the government prove that something of pecuniary value actually changed hands. The words receipt or expectation of receipt should be given their ordinary, everyday meaning, which includes obtaining or expecting to obtain something. In this case, the government alleges that the pecuniary gain is the expectation of taking Donald Lee Allen's motor vehicle and victim Donald Lee Allen's wallet and money.[10]

This instruction tracks the language of § 3592(c)(8).

Both the Fifth Circuit and Tenth Circuit have limited the application of the pecuniary gain aggravating factor "to situations where 'the murder itself was committed as consideration for, or in the expectation of, anything of pecuniary value.'" *United States v. Bernard*, 299 F.3d 467, 483 (5th Cir. 2002) (quoting *United States v. Chanthadara*, 230 F.3d 1237, 1263 (10th Cir. 2000)). In *Bernard*, the Fifth Circuit found the pecuniary gain aggravating factor unsupported by the evidence. 299 F.3d at 483-84. The defendants in *Bernard* carjacked a vehicle and robbed the owners, a married couple, of a wallet, a purse, and jewelry. The defendants then locked the couple in the trunk, drove the vehicle for several hours with the couple in the trunk, and murdered the couple after driving the car to a deserted location near Fort Hood, Texas. 299 F.3d at 472-73. The jury sentenced the defen-

---

[10]As to Count Eight, the district court instructed the jury to refer back to the instructions in Count Seven for the pecuniary gain statutory aggravating factor.

dants to death. One of the aggravating factors found by the jury was that the murders had been committed for pecuniary gain. 18 U.S.C. § 3592(c)(8); *Bernard*, 299 F.3d at 481, 483. The defendants appealed, and the Fifth Circuit concluded that the motivation for the murders was not pecuniary gain but was instead to prevent the couple from reporting the crime to the police. 299 F.3d at 483. "Since no pecuniary gain was expected to flow directly from the homicide, this aggravating factor should not have been considered by the jury in weighing whether to impose the death penalty." 299 F.3d at 483-84.

In *Chanthadara*, defendant Boutaem Chanthadara and four accomplices robbed a restaurant in Wichita, Kansas. 230 F.3d at 1244-45. After taking cash from the register and being unable to open the restaurant's empty safe, Chanthadara shot and killed the wife of the restaurant's proprietor. 230 F.3d at 1245. Chanthadara was charged with and convicted of two offenses, robbery under the Hobbs Act, 18 U.S.C. § 1951(a), and the use of a firearm in a crime of violence under circumstances constituting first-degree murder, 18 U.S.C. § 924(j)(1). 230 F.3d at 1244. The jury sentenced Chanthadara to death for the murder. 230 F.3d at 1244. On appeal, Chanthadara argued that § 3592(c)(8) was inapplicable because all of the valuable property in the restaurant had been seized by the defendant and his accomplices prior to the killing. 230 F.3d at 1263. The Tenth Circuit agreed and explained that the instruction on the pecuniary gain aggravating factor must be clear that in order for the aggravating factor to apply, the actual murder itself must be committed for pecuniary gain, not merely the preceding robbery. 230 F.3d at 1264. In Chanthadara's case, the district court began the jury instructions by saying that "[t]o establish that defendant committed the offense in the expectation of the receipt of anything of pecuniary value . . . ." 230 F.3d at 1263. According to the Tenth Circuit, the use of the words "the offense" failed to specify which offense, the murder or the robbery, was the offense that Chanthadara allegedly committed in order to obtain pecuniary value. Chanthadara was convicted of two crimes, robbery under the Hobbs Act, 18 U.S.C. § 1951(a), and the use of a firearm in a crime of violence under circumstances constituting first-degree murder, 18 U.S.C. § 924(j)(1).[11] Because the jury instructions did not

---

[11]The 18 U.S.C. § 924(j)(1) charge is identical to the charge in Count Eight of Barnette's indictment. Section 924(i)2(1) was redesignated § 924(j)(1).

limit the application of the pecuniary gain factor to the § 924(j)(1) murder offense, the court found the instructions erroneous. 230 F.3d at 1264.

Both *Chanthadara* and *Bernard* are distinguishable from the case at bar. Unlike *Chanthadara*, the jury instructions used by the district court at Barnette's sentencing hearing stated that "the first aggravating factor contended for by the government is the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value . . . ." (JA 1970). The "offense in Count 7," as explained by the district court in its jury charge, is the allegation that

> On or about June 22, 1996, in Mecklenburg County, within the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, with attempt to cause death or serious bodily harm did knowingly, willfully, and unlawfully take by force, violence, and intimidation, that is, he shot to death and took from the person of Donald Lee Allen a motor vehicle which had been shipped, transported, and received in interstate foreign commerce, that is, a 1994 Honda Prelude, . . . in violation of Title 18, U.S. Code, Section 2119.

So the "offense in Count 7" is the intentional killing of Allen during the commission of a carjacking. The district court's instruction linked the pecuniary gain factor to the murder of Allen.

The jury instructions with regard to Count Eight also restricted the application of the pecuniary gain statutory aggravating factor to the crime of use of a firearm during a crime of violence which resulted in a murder. The district court so instructed the jury:

> Like Count 7, Count 8 involves the death of Donald Lee Allen, but a different offense is charged, and the defendant was found guilty of both charges. Count 8 may be said to allege the crime of use of a firearm in a crime of violence, namely, car-jacking, resulting in death.

> Count 8 alleges as follows: On or about June — the 22nd day of June, 1996, in Mecklenburg County, in the Western

District of North Carolina, the defendant, Aquilia Mar-
civicci Barnette, knowingly used and carried a firearm, that
is, a sawed off, Winchester semiautomatic shotgun during
and in relation to a crime of violence for which he may be
prosecuted in a court of the United States, that is, the car-
jacking set forth in Count 7 above, and in the course of this
violation caused the death of Donald Lee Allen through the
use of a firearm, which killing is a murder defined in Title
18, U.S. Code, Section 11-11 [sic], in that the defendant,
with malice aforethought, did unlawfully kill Donald Lee
Allen by shooting him with a firearm, willfully, deliberately,
maliciously, and with premeditation, in violation of Title 18,
U.S. Code, Section 924C1 and I21 [sic].

The district court, like its instructions regarding Count Seven,
instructed the jury that "[t]he first aggravating factor contended for by
the government is the defendant committed the offense in Count Eight
in the expectation of the receipt of anything of pecuniary value. . . .".
Through its instructions, the district court prevented any error which
may have occurred in *Chanthadara* and properly instructed the jury
as to the pecuniary gain statutory aggravating factor. Unlike *Bernard*,
the evidence in the instant case was sufficient for the jury to conclude
that Barnette killed Allen in the expectation of the receipt of some-
thing of pecuniary value, namely Allen's vehicle. Barnette's testi-
mony is telling on this point:

> Question by Barnette's counsel:   Where were you going?
>
> Answer:   I didn't know really, but I was going to get to
> Roanoke.
>
> Q:   Didn't have a car, did you?
>
> A:   No.
>
> Q:   Was there any car around there that you could have
> used that night?
>
> A:   No.

* * *

Q:   You walked up there. What do you have with you?

A:   Got my bag had clothes in it. Had my gun, shells. All kinds of — I don't know what all I put in that bag. Just all kinds of stuff.

Q:   Marc, where did you ever get the idea that you had to have a car that night?

A:   When I left my driveway, everybody had left and I didn't know what I was going to do. I was going to get to Roanoke some way.

Q:   Tell us again why you had to get to Roanoke that night.

A:   I needed to get to Robin.

* * *

Q:   What were you waiting for?

A:   I was going to carjack somebody.

Q:   Were you waiting for somebody to stop on Morris Field or Billy Graham or did it make any difference to you?

A:   It couldn't — if you've driven on Billy Graham, you know it's basically a freeway. Morris Field is two lanes, small. It's almost completely black when the light's not green. I kept watching the cars come down Morris Field. One came down. Another. That's when I said I was going to get a car.

Q:   Were you waiting for a car with only one person?

A:   I didn't know what to do. I just — if it was one person, that would make it easier. I didn't really have a formu-

lation plan, just to get the car. . . . Whatever opportu-
nity was going to present itself, I was going to take
advantage of.

* * *

Q:   Marc, why not just tie this young man to a tree?
     You've got all the tools you need in the bag.

A:   I just — I wasn't thinking. It doesn't make sense. This
     is not some planned hit. I wasn't in it just — I just
     wanted a car. And I just overreacted. I just thought he's
     going to stop me. He's going to stop me. I wasn't cold
     about it. I wasn't meticulous. I was just being a damn
     idiot. And I shot him for no damn reason.

Barnette's own words are certainly evidence that the motivation for
Allen's murder was Barnette's desire for a car. More specifically, it
was Barnette's need for transportation to Roanoke. The pecuniary
value of that transportation, which could have existed in the form of
a bus ticket or a plane ticket, instead manifested itself as Allen's
Honda Prelude. Barnette's own testimony indicates that he wanted
transportation to Roanoke and needed money. He got both by killing
Allen.

   This evidence was sufficient to support the jury's conclusion that
Barnette murdered Allen in the expectation of the receipt of some-
thing of pecuniary value. We find no error, much less plain error, in
the application of the pecuniary value statutory aggravating factor in
this case.

## XI.

   Barnette's eighth claim of error is that the district court failed to
properly investigate possible juror bias. During the sentencing hear-
ing, an alternate juror notified the district court that he had overheard
a juror make a statement that led the alternate juror to conclude that
the juror had made up his mind about the outcome of the case, or was
ready to decide the case before the close of evidence, or had formed

an opinion about the testimony of a witness. The alternate juror was unable to identify the juror who made the statement because there were two jurors who looked alike, and one of those jurors made the statement. After discussing the matter with counsel, the district court brought the jury into the courtroom and asked the jury whether any juror had violated the court's instructions. The district court also asked the jury if anything had happened to impair each individual juror's ability to be fair and impartial. There was no response by the jurors on either question. After this colloquy with the jury, the district court proceeded with the sentencing hearing.

Barnette now claims that the district court failed to conduct a proper investigation into the charges of juror bias. In particular, Barnette emphasizes the fact that the district court did not question each of the two jurors who could have been identified by the alternate juror as the possible source of the statements. The district court has broad discretion in choosing how to handle a claim of juror bias or misconduct. See *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988); *United States v. Bradshaw*, 787 F.2d 1385, 1389-90 (10th Cir. 1986). "The Fourth Circuit follows the view that the trial court may deal with [claims of juror misconduct] as it feels the particular circumstances require and only reverse for abuse of discretion." *Gravely*, 840 F.2d at 1159. See also *United States v. Duncan*, 598 F.2d 839, 866 (4th Cir. 1979) (the circumstances in which juror misconduct can occur are probably as varied as all of human experience).

We conclude that the district court did not abuse its discretion in conducting its investigation into possible juror misconduct or bias. The district court questioned the alternate juror and asked if whatever he had heard said by the juror or jurors had risen to the level of debate and discussion, thus violating the district court's instructions. The alternate juror responded that he did not think that it had approached that level. The district court then asked the entire jury if any juror had violated the courts's instructions, and received no response. The district court then reminded the jury of the district court's instructions to refrain from deliberating or discussing the case and from talking to anyone about the case. No member of the jury indicated that a juror had violated the district court's instructions. This distinguishes the instant case from *United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993), a case cited by Barnette.

In *Resko*, the Third Circuit determined that the district court abused its discretion in refusing to further investigate a claim of juror misconduct after all members of the jury acknowledged in a questionnaire that they had begun discussing the case in violation of the district court's instructions. 3 F.3d at 691. In our case, none of the jurors admitted that a violation of the district court's instructions had occurred, indeed denying such by silence in response to the court's questions. The district court, having investigated the matter raised by the alternate juror, proceeded with the sentencing hearing. We are of opinion and hold that the district court did not abuse its discretion in handling the matter.

## XII.

Barnette next asks the court to reconsider "several" of our rulings from Barnette's first appeal which he acknowledges became law of the case. He especially argues that the victim impact aggravating circumstance is vague and not supported by the evidence; that the grave risk of death aggravating circumstance is vague and unsupported by the evidence; and that allocution by Barnette to the jury should have been allowed. See *Barnette*, 211 F.3d at 817-820. Under the law of the case doctrine, once a court decides an issue of law, that decision controls the same issue at subsequent proceedings in the same case.[12] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988). Once we have ruled on a question of law, our decision should be followed in later proceedings in the same case, including a subsequent appeal, unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988), (quoting *EEOC v. Int'l Longshoremen's Ass'n*, 623 F.2d 1054, 1058 (5th Cir. 1980)). There is nothing in the record to support the conclusion that one of the three exceptions noted above is applicable in this case. Our

---

[12]In *Humphries v. Ozmint*, 366 F.3d 266 (4th Cir. 2004), we vacated a sentence because defendant's attorney failed to object to argument by the prosecutor upon admittedly proper victim impact evidence. *Humphries* has no effect on our decision.

decisions on those questions of law from Barnette's first appeal are law of the case and we decline to reconsider the same in this appeal.

## XIII.

### A.

Barnette argues that evidence of criminal convictions and also unadjudicated criminal activity introduced by the government in an effort to prove the nonstatutory aggravating factor of future dangerousness contributed to the jury's decision to impose the death sentence. The jury concluded that the government failed to prove beyond a reasonable doubt that Barnette would be "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society." Despite this finding in Barnette's favor, Barnette contends that the evidence introduced by the government in its attempt to prove the aggravating factor contributed to his death sentence. We reject this contention.

First, the jury considered the evidence of such criminal conduct and found it insufficient to support a finding that Barnette would be likely to commit criminal acts of violence which would be such a serious threat to society. In other words, this evidence which Barnette argues is objectionable did not even satisfy the government's burden of proving that Barnette would be a threat to commit future crimes as described in the instruction. Second, the district judge gave instructions to the jury that they were to separate the evidence for each capital count and deliberate on each capital count separately from the others. "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). We have been presented with no evidence that suggests that the jury did not perform its duty in accordance with its oath to follow the instructions given by the district court. Third, the evidence introduced by the government was presented in an effort to prove a nonstatutory aggravating factor which has *not* been held to be invalid, rather found wanting in evidentiary support. Cf. *Clemons v. Mississippi*, 494 U.S. 738 (1990).[13] Barnette's argument, if upheld,

---

[13]We note that Barnette's argument is similar to the issue raised in *Zant v. Stephens*, 462 U.S. 862 (1983). *Zant* would likely control

would require separate sentencing hearings and jury verdicts for each non-statutory aggravating factor that the government seeks to prove. By its terms, the Federal Death Penalty Act contemplates only a single sentencing hearing at which the jury will consider evidence that is "relevant to an aggravating factor for which notice has been provided." 18 U.S.C. § 3593(c). Only such relevant evidence was introduced here, and we are of opinion that such was not error.

We are of opinion that the introduction of this evidence did not cause the jury to recommend the death sentence on the basis of passion, prejudice, or any other arbitrary factor. As we noted in our opinion in Barnette's first appeal, "[w]e recognize that while the proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless." *Barnette*, 211 F.3d at 821.

## B.

Barnette also claims to be erroneous the district court's exclusion of a 40-minute videotape on workplace violence made by Dr. Dietz, the government's mental health witness, which videotape was not connected with this case. What he wanted to prove was that Dr. Dietz had stated in the tape that "People who commit murders while experiencing 'threats, paranoia, fixation, jealousy,' as here, deserved 'help, dignity, and respect.'" Blue Br. at 100. He claims that the just-quoted expert opinion on the tape was pertinent to the cross-examination of Dr. Dietz, who had expressed opinions about Barnette "that were not so charitable." Obviously, Dr. Dietz had not been cross-examined on that very subject, at least if he was, we have not been advised of the transcript reference. The district court advised the defendant that he could cross-examine Dr. Dietz at "any length you deem necessary

Barnette's argument and require almost routine affirmance if the Federal Death Penalty Act was a non-weighing capital punishment statute. For example, the Virginia Supreme Court upheld a death sentence challenged on the same argument made by Barnette, but Virginia's death penalty statute is a non-weighing statute. See *Schmitt v. Commonwealth*, 547 S.E.2d 186, 201 (Va. 2001). The Federal Death Penalty Act is a weighing statute. See *United States v. Jones*, 132 F.3d 232, 250-51 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999).

within reason to cross-examine him about that" (referring to preventing domestic violence).

Immediately following that advice to the defense attorneys, the examination of Dr. Dietz continued for some three pages, and discussion of the subject for another two or three. At no place, following the advice that he could cross-examine at any length deemed necessary within reason, did Dr. Dietz testify contrary to that part of the tape now claimed to be crucial. There is little doubt that if Dr. Dietz had offered an opinion on cross-examination contrary to an opinion that he had expressed in the tape, the same discrete item might well have been, and probably would have been, admissible. Barnette has called to our attention no evidence given by Dr. Dietz which might have been contradicted by some discrete part of the 40-minute tape. Foundation was simply not laid to contradict Dr. Dietz, and the introduction of the tape, which was obviously hearsay, was properly rejected by the district court, which observed that it also had relevancy problems.[14]

We are thus of opinion that the exclusion of the tape by the district court was not error.

XIV.

Pursuant to 18 U.S.C. § 3595(c), we have addressed all substantive and procedural issues raised in this appeal, and we have considered whether the sentence of death was imposed under the influence of

---

[14]Indeed, in that same part of the transcript, the following question and answer of Dr. Dietz ended Dr. Dietz's testimony before the jury:

Q.  And at the end you showed little snippets of each one of these people who had killed strangers to get to — to try to get to their primary object, which is their boss, their supervisor, and you said, this is not about evil, this is about getting people help and treating them with the dignity and respect that they deserve, each one of those people, didn't you?

A.  I said these cases are not about evil, they are about troubled people and so on.

MR. BENDER: Thank you. That's all.

passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under § 3592.

We have examined the record in the case and have heard oral argument. We are of opinion and hold that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. We are further of opinion and hold that the evidence supports the special findings of the existence of aggravating factors required to be considered under § 3592(c); Count Seven, carjacking and killing of Allen, factor (c)(8), pecuniary gain, and factor (c)(9), substantial planning and premeditation; Count Eight, use of a firearm in carjacking of Count Seven and killing of Allen, factor (c)(8), pecuniary gain and factor (c)(9), substantial planning and premeditation; and Count Eleven, use of a firearm in a crime of domestic violence and killing of Robin Williams, factor (c)(5), grave risk of death to additional persons, factor (c)(9), substantial planning and premeditation.

It is not out of place for us to remark on the infinite care taken by the district court in the trial of this case, and that applies to both the first and second trials. In the second sentencing hearing, for example, with which we are immediately concerned, there were 90 separate questions put to the jury, of which it was required to answer 87 of the same, which were answered.

We are further of opinion and hold that the proceedings did not involve any other legal error requiring a reversal of the sentence, which error was properly preserved for appeal under the Rules of Criminal Procedure.

The judgment of the district court is accordingly

*AFFIRMED*.